IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| In re: | * |
| **Stuart Robert Hansen** | * |
| **Mary Sue Hansen,** | * |
|     Debtors | *   Case No.   14-23744 |
| | *   (Chapter 11) |

\* \* \* \* \* \* \* \* \* \* \*

**APPLICATION OF GEORGE R. ROLES AND RUSSACK ASSOCIATES, LLC
FOR FIRST INTERIM ALLOWANCE OF COMPENSATION AND
REIMBURSEMENT OF EXPENSES AS COUNSEL FOR DEBTOR
FOR THE TIME PERIOD BETWEEN JUNE 29, 2015 AND OCTOBER 27, 2015**

George R. Roles and Russack Associates, LLC, (the "Applicant"), the Court-approved counsel for Stuart Robert Hansen and Mary Sue Hansen, (the "Debtors" and/or "Debtors-in-Possession"), applies for its first interim allowance of compensation in the amount of $26,191.25 and reimbursement of expenses in the amount of $322.13 for the period July 1, 2015 through October, 27, 2015 (the "Application Period") and, in support thereof, states:

1)      This Court has jurisdiction to hear this matter pursuant to 28U.S.C. §§ 157 and 1334, 11 U.S.C. §§ 328, 330 and 331, Bankruptcy Rule 2016 and Local District Court Rule 402. This is a core proceeding.

**Introduction and History of Case**

2)      The Applicant consulted initially with the Debtors on August 19, 2014, at which time, the Debtors retained the Applicant for the purposes of preparing and filing a Chapter 7 Bankruptcy case, the goal of which was to liquidate all non-exempt property, satisfy all secured debt, and obtain a discharge of any dischargeable unsecured debt.

3)      For the initial Chapter 7 case, on August 19, 2014, the Debtors paid the Applicant $5,000.00 as a flat fixed fee for the preparation and work in the Chapter 7 case. The same date, the Applicant also collected from the Debtors $335.00 for the Court's filing fee.

1

4) On June 4, 2015, the Applicant met with the Debtors to review the case status, and at that time, it appeared that the Chapter 7 case, which at that time had been active for nearly nine months, had not progressed to liquidation of a single asset.  This was so despite having all of the Debtors' significant personal property professionally appraised (which is worth in nearly of $250,000.00), despite the fact that the Debtors' primary residence, (which is worth in excess of $2,500,000.00) had been marketed by the Chapter 7 Trustee's realtor for more than 6 months without an offer, and despite the Debtors on-the-record desire to liquidate all non-exempt property.

5) At the Applicant's June 4, 2015 meeting with the Debtors, it was decided that the best interest of the Debtors and the creditors would be served with a more speedy liquidation wherein the Debtors controlled the rate and character of the liquidation, and as such, the Applicant advised the Debtors to convert the Chapter 7 case to one under Chapter 11.

6) Prior to filing the motion to convert this case, the Applicant undertook to negotiate with the primary creditors and gained those creditors cooperation would not oppose such a motion.

7) On June 5, 2015, the Debtors retained the Applicant for the purposes of converting this case to one under Chapter 11 and prosecuting the Debtors goals in Chapter 11 that remained the same as they were in Chapter 7 – to liquidate at the highest and best values all of the non-exempt property, pay most or all secured debt, and settle or discharge all remaining debt – and to do so by way of a confirmed Chapter 11 plan.

8) On June 26, 2015, the Applicant filed the Debtors' Motion to Convert to Chapter 11, and on June 29, 2015, this Court granted the motion, and this case became one under Chapter 11.

9) Prior to conversion of this case, on June 5, 2015, the Debtors paid, and the Applicant deposited into its trust account, $7,500.00, and the Debtors had trust account credit in the amount of $181.25. Also prior to conversion of this case, on June 15, 2015, the Debtors paid, and the Applicant deposited into its trust account, $2,500.00. So then, the total trust account balance held by the Applicant for the Debtors for Chapter 11 work prior to conversion was $10,181.25 of which $6,133.66 was applied to pre-petition work done from June 4, 2015 through June 29, 2015. The Debtors have since made a further retainer deposit of $2,500.00 on July 10, 2015. All remaining funds totaling $6,548.19 are held in escrow.

10) As stated above, at the time of conversion, the Debtors were in possession of significant equity in both personal and real property that was property of the estate. The Debtors' primary residence is unique both in character and value considering its location and requires a level of sophistication and nuance as to its valuation and marketability. Further, much of the Debtors personal property is also of unique character and value – some one of a kind art and antiques – that requires special attention to professional valuation and liquidation.

11) At the time of conversion, a significant portion of the Debtors secured debts were cross collateralized in terms of security interest spreading amongst multiple personal property and realty and in terms of multiple liens of that character on various pieces of personal property.

12) Also at the time of conversion, the Debtors had committed to making significant monthly payments, (more than $5,500.00 per month), to one such secured creditor, and so the level of securitization by that creditor and other creditors as a result constantly changed and is

still changing. Each month that goes by, the secured creditors liens gained more value. Those payments have now ceased, because the secured creditor receiving those payments has been paid in full.

13) The Debtors' financial circumstances, as well as the posture and character of their assets and exemptions, are of a more complicated nature, and the Applicant requires extended time, but will file any required amendments to schedules and statements. The Applicant continues, as of this date, to analyze and consider appropriate amendments as may be contemplated within any Chapter 11 Disclosure and Plan.

14) Since the date of conversion, the Applicant has prepared and filed a motion to sell a $40,000.00 asset and an emergency motion to shorten time with regard to that motion. The Applicant reviewed and responded to the responses to that motion, and attended the hearing on that motion. Ultimately, that motion was granted, that asset has been sold, and there is now pending an imminent total distribution to creditors in the amount of $40, 000.00.

15) Since the date of conversion, the undersigned has prepared and filed two applications to employ professionals, and has reviewed and responded to a motion regarding secured status. These motions have all now been resolved without significant detriment to, and rather to the benefit of the estate.

16) With regard to the applications and motions in the previous paragraph, the undersigned has undertaken to provide proper notice and service as required by the rules, reviewed and responded when necessary to objections/responses, and communicated often with opposing counsel in those regards. Ultimately, the undersigned successfully negotiated a pending consent regarding the motions regarding secured status that will lead to an

4

imminent $40,000.00 distribution to creditors.

17) The undersigned is now in negotiations with primary secured creditors to establish the best mode and timing of liquidation – i.e. typical market sale vs. public auction; wintertime vs. summertime. To this end, the Applicant presumes that liquidation will occur within the next six months, for the benefit of the estate, and is continuing efforts in those regards.

18) The undersigned attended the individual debtor interview and the 341 meeting of the creditors with the Debtors, and responded timely to the United States Trustee's list of requested items and documents that was the outcome of those events.

19) The undersigned has assisted the Debtors in acquiring Debtor-in-Possession accounts, preparing Monthly Operating Reports, and successfully completed the sale of a significant asset upon this Court's order.

20) The Applicant's overall objective is the resolution of the Debtors' Chapter 11 case through liquidation and debt settlement.

21) The Applicant oversaw and reviewed Paralegal's compilation of documents and data for filing the motions and operating reports, as well as pending amendments to schedules and SOFA.

22) This is the Applicant's first fee application. The Applicant is familiar with, and is submitting this Application in conformity with, the Compensation Guidelines for Professionals in the United States Bankruptcy Court for the District of Maryland (the "Compensation Guidelines").

23) The Applicant is an associate at Russack Associates, LLC, ("RAL"), a law firm concentrating a majority of its practice on Bankruptcy Law. RAL employs the following

professionals identified by name, job title, timekeeper initials, experience, and hourly billable rate.

| Tate Russack, Esq. (TMR) | Barred in Maryland since 2000 | $425.00 |
| Cami Russack, Esq. (CMR) | Barred in Maryland since 2000 | $425.00 |
| Daniel S. Staeven (DSS) | Barred in Maryland since 2005 | $325.00 |
| George Roles, Esq. (GRR) | Barred in Maryland since 2012 | $325.00 |
| Marybeth Young, Paralegal (MBY) | Certificated Paralegal since 2002 | $200.00 |
| Lori Whitehead (LW) | Degreed Paralegal since 2005 | $175.00 |

**Compensation Requested and Legal Standard to be Applied**

24) The Applicant requests an award of compensation in the aggregate amount of $26,191.25 for services rendered and $322.13 as reimbursement of expenses incurred during the Application Period.  The aggregate amounts of compensation requested and expenses incurred follows:

| Total hourly billing: | Total hours billed: | Blended hourly rate: |
|---|---|---|
| $26,191.25 | 76.60 | $341.92 |

| Total Expenses | |
|---|---|
| Copies postage | $322.13 |

| Total Professional Time Analysis (* line item accounting attached) | | | |
|---|---|---|---|
| Name | Total Hours | Hourly Rate | Total Fees |
| Tate Russack (TMR) | 37.45 | $425.00 | $15,916.25 |
| Cami Russack (CMR) | 0.0 | $425.00 | $     0.00 |
| Daniel Staeven (DSS) | 2.6 | $325.00 | $   845.00 |
| George Roles (GRR) | 17.2 | $325.00 | $ 5,590.00 |
| Marybeth Young (MBY) | 18.15 | $200.00 | $ 3,630.00 |
| Lori Whitehead (LW) | 1.2 | $175.00 | $   210.00 |
| TOTALS | 76.60 | | $26,191.25 |

25) The expenses incurred by the Applicant are of a type that are customarily not considered part of overhead by the Applicant or other attorneys in this geographic area and which the Applicant customarily requires its clients to pay. Additionally, all of the expenses for which the Applicant seeks reimbursement are in accordance with and allowable pursuant to the Compensation Guidelines.

26) The Applicant's request for compensation is made pursuant to the twelve criteria originally enumerated in *Johnson v. Georgia Highway Express. Inc.*, 488 F.2d 714, 714-719 (5th Cir. 1974), and expressly adopted by the United States Court of Appeals for the Fourth Circuit in *Barber v. Kimbrells, Inc.,* 577 F.2d 216 (4th Cir. 1978), *Anderson v. Booths*, 658 F.2d 246 (4th Cir. 1978), and *Harman v. Levin (In re: Robertson),* 772 F.2d 1150 (4th Cir. 1985). The twelve criteria are as follows:

    a) the time and labor expended;
    b) the novelty and difficulty of the questions raised;
    c) the skill required to properly perform the legal services rendered
    d) the attorney's opportunity costs in pressing the instant litigation
    e) customary fee for like work;
    f) the attorney's expectations at the outset of the litigation;
    g) the time limitations 4 imposed by the client or circumstances;
    h) the amount of controversy and the results obtained;
    i) the experience, reputation and ability of the attorney;
    j) the undesirability of the case within the legal community in which the suit arose;
    k) the nature and length of the professional relationship between the attorney and client; and
    l) attorney awards in similar cases.

*Barber v. Kimbrells Inc.,* 577 F.2d at 226 n 28. These criteria are discussed in detail below.

27) When considering an attorney's application for compensation, the Court should first

7

determine the attorney's "lodestar" by multiplying the number of hours reasonably expended by a reasonable hourly rate. *In re LBH Associates Ltd. Partnership*, 109 B.R. 157, 158-62 (Bankr. D. Md. 1989); *see also*, *In re Leonard Jed Co.,* 118 B.R. 339, 345 (Bankr. D. Md. 1990).

28) Fees should be adjusted upward if the results achieved by the attorney are exceptional in light of the hourly rate charged. *Blum v. Stersor*, 465 U.S. 889 (1984); *also see generally*, *Pennsylvania v. Delaware Valley Citizens' Counsel*, 478 U.S. 546 (1986); *Hansley v. Eckerhardt*, 461 U.S. 424 (1983). Based upon the twelve Johnson criteria as discussed below, there is no basis for any downward adjustment of the Applicant's fees.

29) The total fee requested by the Applicant are reasonable under the circumstances, and the *Johnson* twelve-factor analysis, as discussed below support an award of interim compensation in the amount requested.

<b>The Services Rendered and the Manner of Recording<br>Applicant's Fees and Expenses Related Thereto</b>

30) In accordance with the Compensation Guidelines, this Application contains a description of the services rendered in the file for which the Applicant has provided services. All of the time expended and the nature of the services rendered by the Applicant were recorded on time sheets maintained on a daily basis. Attached as Exhibit A is a compilation of the applicant's billing reports for the Application Period, showing all services provided. The billing reports set forth the date of each service rendered, the individual rendering the service, a description of the services rendered and the amount of time spent performing each service.

31) For each time entry, the Applicant provided in reasonable detail that amount of information necessary to give a description of the services rendered while simultaneously

protecting the attorney-client and work-product privileges. Each entry includes a description of the services, an indication of who performed the services and the amount of time spent on each particular service. Certain time entries cannot be written in anymore-substantive detail because one or more privileges would be violated. The Applicant attempted, in accordance with the Compensation Guidelines, not to lump services; for significantly most entries in excess of one hour of time, the time entries provide a breakdown of the amount of time spent on a specific activity included in that time entry if more than one service was rendered.

32) Due to the significant amount of work required of the Applicant, the Applicant adopted a "team approach" to complete successfully many of the tasks it was required to perform. By way of example, but not limitation, there were many instances in which several of the Applicant's professionals were each required to perform separate tasks simultaneously. An example of the application of the team approach is the preparation of the monthly operating reports on behalf of the Debtors. While the Applicant's professionals approached this and several other tasks as a team, the Applicant was mindful not to engage in duplication of effort and each professional handled discrete tasks within the overall project.

33) Based upon the Applicant's experience, the Applicant believes that the team approach is the most effective, efficient and least costly manner of handling complex and sophisticated tasks, such as those encountered in this case, in short periods of time, while at the same time providing the highest level of representation to the Debtors.

34) The Applicant's fees were computed at the standard hourly rates charged by the Applicant to all of its creditor, debtor and trustee clients. The hourly rates vary by professional

depending upon experience, subject matter, expertise and seniority. The hourly rates charged by the Applicant are within the range of, (and are typically lower than), customary hourly rates of compensation in this geographic area for the services performed in cases of this magnitude.

35) The disbursements are reasonable and necessary and are in accordance with the Compensation Guidelines and, as discussed above, in the exercise of billing judgment, the Applicant is not seeking compensation for secretarial overtime.

36) The Applicant charges 25 cents per page for in-house copying. The Applicant always reviews copy jobs to determine whether it would be more cost and time efficient to send such jobs to outside copy services, which it did on a number of occasions.

37) The Applicant only uses regular mail, delivery, and/or courier services only when electronic means of transfer/communication are not available.

### The Time and Labor Expended

38) After a the consultation with the Debtors in June of 2015, the Applicant recommended the Debtors convert their case to a Chapter 11 Bankruptcy case and was subsequently retained by the Debtors to seek such a conversion and perform any and all work required to complete amendments to petitions, schedules, pleadings and negotiations for that Chapter 11.

39) The Applicant counseled the Debtors with respect to the advantages of entering into a Chapter 11 in order to negotiate debt and claim settlement, protect the Debtors' exempt assets, continue Debtor-husband's business operations and productivity, and to increase cash flow.

40) As Debtors' counsel, the Applicant conducted an extensive review of the Debtors' property and its financial affairs. In the course of due diligence after filing the motion to

convert to Chapter 11, the Applicant prepared draft Motions to Employ Professionals regarding the complex issues of selling the Debtors' unique real estate and personal property during the pre-disclosure period of a Chapter 11 case.

41) The Applicant worked with opposing counsel regarding the early-filed Motion to Sell, acquired the consent of secured creditors and opposing counsel, coordinated the sale transaction, and now has negotiated a consent to the terms of net distributions to creditors.

42) During the process of due diligence, document collection and financial analysis, it became apparent to the Applicant that the Debtor utilized archaic accounting processes, which created large amounts of manual data processing and re-processing in order to create accurate operating reports.

43) After several months of lengthy review of the Debtors internal financial reports and reporting processes, the Applicant determined that the only accurate resource to acquire data from the monthly volume of checks, payables, and income was the Debtors Bank Statements and sporadic financial statements.

44) The Applicant directed a paralegal and oversaw the preparation of the monthly operating reports and to assure that the Debtors remain current on their reporting, necessary to continue with Chapter 11 Case and avoid the case being converted to one under Chapter 7.

45) The Applicant responded to specific creditor request of document production and worked with the US Trustee and the creditor to successfully satisfy the US Trustee after the meeting of creditors in order to satisfy the Trustee's and some creditors' specific scrutiny.

46) It became necessary for the Applicant to prepare and file emergency motions to shorten time in order that the sale of personal property could occur, as offers on that personal property were viable and pressing.

47) The Applicant reviewed and prepared, where appropriate, responses to pleadings, motions and papers requiring responses. Additionally, the Applicant has kept the Debtors apprised of all matters arising and has responded to all the Debtor's inquiries and requests for assistance throughout the course of this bankruptcy case.

## Novelty and Difficulty of Questions Raised

48) The novelty of this case appears in the complex claims and cross collateralized claims filed regarding significant business and judgment debt, both in defense of attacks on the Debtors and in prosecution of Debtors' claims. Bankruptcy attorneys practicing in this geographic area would consider this case to be complex.

## Level of Skill Required

49) The level of skill required from the Applicant is at the highest level to insure that the Debtors' interests have been and continue to be protected. The Applicant's work required a coordinated effort among three attorneys and involved issues of business law, contract law, and local state and property laws, and extra-jurisdictional laws. The different levels of skill are also reflected as required in the different hourly rates charged by the professionals who provided services to the Debtors.

## Opportunity Costs

50) Applicant performed this work at the cost of foregoing the opportunity to perform other work, which would have paid similar hourly fees.

## Customary Fee For Like Work

51) The hourly rates for the individual professionals of the Applicant's firm working in this case are the normal and customary rates charged by the Applicant for its services to debtors, trustees, and committees in other bankruptcy cases and to clients in non-bankruptcy matters in the Annapolis area. The hourly rates are within the customary

12

range charged by other attorneys in the Maryland area, (in many instances, the Applicant's rates are lower), and the total compensation sought is reasonable compared with fees charged by other similarly situated law firms in cases of this magnitude and complexity.

### Applicant's Expectation at the Outset of Litigation

52) The Applicant expected that it would be compensated for services rendered at its standard hourly rates and would be reimbursed for all out-of-pocket disbursements made on behalf of the Debtors.  The Applicant has sought reimbursement only for the out-of-pocket expenses that are normally not considered overhead.

### Amount in Controversy and Results Obtained

53) The overall objective is the resolution of the Debtors' Chapter 11 case through liquidation of all non-exempt assets and debt settlement.  The Debtors are taking the steps necessary to reach that goal through employment of professionals, property liquidation strategies, and continued negotiations with creditors.

### Time Limitations

54) Many of the services required of the Applicant and the professionals in his firm were provided under tight time limitations.  There were some instances when the Applicant and/or his firm's professionals worked extended hours in order to meet deadlines in this case and to start expediting the liquidation.

### Undesirability of the Case

55) This factor has only limited applicability to this case.  However, the bulk of the time this Applicant and his firm's professionals spent was working within the Debtors archaic accounting practices, larger than normal personal property estate, and complex lien structure, in order to meet this Court's reporting requirements and the scheduling requirements of the Bankruptcy Code, and to do so as accurately as possible.

13

**Nature and Length of Professional Relationship With Client**

56) Prior to the initiation of this bankruptcy case, the Applicant did not represent the Debtors in any other matters.

**Attorney Fee Awards in Comparable Cases**

57) The fees requested by the Applicant in this case are comparable to or lower than fees allowed in cases of similar size and complexity, based on the time expended, the customary hourly rates and the difficulty of the representation.  The Applicant has made a concerted effort to centralize responsibility for different aspects of this case and to assign responsibility to attorneys and a paralegal in an economical and efficient manner, specifically in regard to preparation of draft pleadings and operating reports.

**General Conditions**

58) All legal services for which compensation are requested in this Application were performed for and on behalf of the Debtors and not on behalf of any other person.  After the filing of these cases, no beneficial interests direct or indirect, or claim against, or interest of the Debtors has been acquired by the Applicant or for its account.

59) No agreement or understanding exists between the Applicant and any other person for the sharing of compensation to be received by it for services rendered in connection with this case, except within the law firm of Russack Associates, LLC.  No agreement or understanding exists between the Applicant and any other person rendering services in connection with this case for the sharing of compensation of such other person.

60) Consideration of the circumstances of this case and the twelve-factor test of *Barber v. Kimbrells, Inc.* indicate that no downward adjustment in the overall fees of the Applicant is warranted.  The work performed by the Applicant has provided the Debtors and the

estate with significant benefits in that an agreement has been reached with one of the Debtor's largest creditors and negotiations are ongoing and favorable with the remaining asset liquidation, creditor payment, and debt negotiation.

61) Notice of this Application has been given to the United States Trustee, all creditors, all parties-in-interest who have filed a request with the Clerk that such notices be mailed to them, and all persons entitled to receive notice pursuant to the Bankruptcy Rules.

62) In accordance with the Local Bankruptcy Rules of this court, no memorandum of law is filed in support of this application.

**WHEREFORE**, George R. Roles and Russack Associates, LLC, respectfully requests the following relief:

a) That George R. Roles and Russack Associates, LLC, be awarded interim compensation in the amount $26,191.25 for fees, plus reimbursement of expenses in the amount of $322.13.

b) That George R. Roles and Russack Associates, LLC, be authorized to apply any retainer against any award of fees and expenses; and

c) That the Debtors be authorized to pay George R. Roles and Russack Associates, LLC, the fees and expenses awarded; and

d) That George R. Roles and Russack Associates, LLC, be granted such other and further relief as is just and equitable.

Respectfully Submitted,

/s/ George R. Roles
George R. Roles #18371
Russack Associates LLC
100 Severn Ave. Suite 101
Annapolis, Maryland 21403
410-505-4150   410-510-1390 Fax
george@russacklaw.com
Attorney for the Debtors